AMERICAN NATIONAL INSURANCE COMPANY *v.* AMBORT.

4-4270

Opinion delivered June 1, 1936.

*Coleman & Riddick,* for appellant.

*Rose, Hemingway, Cantrell & Loughborough,* for appellee.

SMITH, J. J. E. Ambort was a member of a labor union known as the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, hereinafter referred to as the Brotherhood. Its general office is in Kansas City, Missouri. As a member of the

Brotherhood, Ambort was entitled to receive, and did receive, a certificate showing that his life was insured in the sum of a thousand dollars under a certain group insurance policy which the Brotherhood had procured from the American National Insurance Company upon the lives of its members. This group policy was issued in July, 1929, and has since been in effect. Ambort's certificate under the group policy was issued to him November 6, 1933. The Brotherhood is a fraternal order composed of members of the craft of boilermakers and ship builders. It is both a labor union and a fraternal association.

The constitution and by-laws of the Brotherhood prescribe the terms upon which one might become a member, and the required action on the part of a member to continue his membership. The master or group policy provides that the Brotherhood itself shall pay to the insurance company, monthly in advance, the premium required of each member in good standing. The insurance company did not collect premiums from the individual members. It did not know and was not required to know where the monthly premium per member paid to it by the Brotherhood came from. The master policy provides that "the International Brotherhood shall pay to the (insurance) company one and 1/6 dollars per month, in advance, bearing in mind the grace period herein provided, for each member insured hereunder."

By its express terms the master policy covered only members of the Brotherhood, but covered all members who were in good standing. The individual certificates issued to the members contain recitals to the same effect. The constitution of the Brotherhood granted members sixty days' grace in the payment of monthly premiums, but provided that the member whose premiums remained delinquent beyond the grace period should automatically be suspended. The insurance automatically ceased to be effective upon the suspension of the member.

The last premium paid the Brotherhood by Ambort was on March 31, 1934. He was shot on the night of September 21, and died from the effects thereof on September 30, 1934. During this six months' interval Am-

bort was. not employed at his craft. He was given what is called a withdrawal card, which recites that "when holder returns to work at trade this card must be deposited immediately; failure to do so it stands revoked. All rights and privileges of membership terminate with the acceptance of this withdrawal card."

On the morning after Ambort was shot, a friend of his beneficiary applied to Gibson, the secretary of the local lodge of the Brotherhood, for Ambort's reinstatement, and was advised by Gibson that the sum of $3.75 was required and would suffice to effect the reinstatement of Ambort as the holder of an effective certificate of insurance. That sum was paid to Gibson, who remitted it to Charles F. Scott, the national secretary-treasurer of the Brotherhood, in Kansas City. The remittance was made with a postoffice money order, which Scott promptly returned to Gibson, in whose possession it has since been.

In the letter from Scott to Gibson returning the remittance of $3.75 it was explained that, when the members to whom these cards had been issued, returned to work, "they must immediately deposit their emergency cards and make application for membership, as explained in another letter going forward today."

The letter from Gibson to Scott advised that the $3.75 was sent to pay two months' back insurance and the current month's premium. Scott replied that if Ambort, the applicant, had returned to work, to send his withdrawal card, with the membership application, and a total remittance of $5, to pay two months' back insurance and to cover the cost of one month's dues and insurance, "and his receipt will be issued accordingly." The letter continued: "If he has not returned to work at the trade, have him keep his emergency withdrawal card, to be deposited when he does return to work at the trade." This letter was written under the assumption that the 1930 Constitution of the Brotherhood governed.

No attempt was made to comply with these directions. The insistence is that it was not necessary to do so, as the representative of Ambort's beneficiary had

done all that Gibson had said was necessary to reinstate the insurance, to-wit, pay him $3.75.

The directions given by Scott in the letter above referred to were in conformity to the revised constitution of the Brotherhood adopted in 1930, and the insured's beneficiary insists that compliance with the constitution of 1930 was not essential, as the certificate here sued on was governed by the 1925 constitution of the Brotherhood by the express provisions of the recitals of the master or group policy. It appears to be conceded that the provisions of the 1930 constitution were not complied with, and that the certificate of insurance had lapsed if the constitution of 1930 governs.

We find it unnecessary to determine whether the 1930 constitution governs or not, as we are of opinion that the certificate here sued on had lapsed under the provisions of the 1925 constitution. Assuming, therefore, that the insured's beneficiary is correct in the contention that the 1925 constitution applies, we consider the provisions of that constitution only, although it appears that the letters from and to the local secretary above referred to were written under the assumption that the 1930 constitution governed.

Ambort's wife was named as his beneficiary. She brought this suit as such, and from a judgment in her favor is this appeal.

Now, the undisputed fact is that Ambort had voluntarily terminated his relation with and his membership in the Brotherhood. This being true, his insurance automatically ceased. He was not delinquent in any respect, as he had paid all dues and premiums to March 31, the date of his withdrawal card. Notwithstanding his withdrawal Ambort might have continued his insurance. Section 13 of article 12 of the constitution of 1925, provided that this might be done by the monthly payment of $1.50, which payment would have kept the insurance in full force and effect except as to double indemnity benefits.

Ambort did not make these payments, and for the last six months of his life his status was that of an ex-member, having withdrawn from the Brotherhood without continuing his insurance in force, as he might have

done. Ambort was never reinstated as a member, and never made any effort whatever to be reinstated.

Now, it is true that representatives of his beneficiary, after he was shot, had paid Gibson, the secretary of the local union, the sum of $3.75, which they were told was all that was required to reinstate Ambort's insurance. But this was not true under the constitution of 1925 or that of 1930. Gibson had no connection with the insurance company, and was not its agent. He did have authority to collect dues and assessments from the local members and to make remittances to the Brotherhood, furnishing names of members whose premiums were paid. But he had no authority to make payments for persons who were not members of the Brotherhood, as only its members were covered by the group insurance policy. Ambort, not being one of the members, was not covered by the group policy, and the remittance to Scott, the general secretary of the Brotherhood, even though it had been for the correct and sufficient amount, did not have the effect of making Ambort's certificate effective.

A verdict should therefore have been directed for the insurance company, as there are no disputed questions of fact. The judgment will be reversed, and as the cause has been fully developed it will be dismissed.

JOHNSON, C. J., and HUMPHREYS and MEHAFFY, JJ., dissent.